

**Signed and Filed: December 01, 2010**

_____
**THOMAS E. CARLSON**
**U.S. Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>NANCY YUDELSON LEWELLEN,<br><br>Debtor. | Case No. 07-31666 TEC<br>Chapter 7 |
| NANCY YUDELSON LEWELLEN,<br><br>Plaintiff,<br><br>vs.<br><br>ACCESS GROUP, INC.; KENTUCKY HIGHER EDUCATION STUDENT LOAN CORPORATION; EDUCATIONAL CREDIT MANAGEMENT CORPORATION; ACS; and ALLIED INTERSTATE, INC.,<br><br>Defendants. | Adv. Proc. No. 08-3119 TC |

## MEMORANDUM DECISION

Plaintiff seeks a determination that her student loans should be discharged, because repayment of those loans would impose an undue hardship on her. The court held a trial in the matter on October 12, 2010. Plaintiff Nancy Lewellen (Lewellen) appeared <u>in</u>

MEMORANDUM DECISION -1-

pro per. Miriam E. Hiser appeared for Defendant Educational Credit Management Corporation (ECMC). Sydney E. Fairbairn appeared for Defendant Access Group, Inc. (Access Group). Upon due consideration, and for the reasons set forth below, the court determines that the loan payable to ECMC should be discharged in part, and that the loan held by Access Group should be discharged in full.

BACKGROUND FACTS

Plaintiff Nancy Lewellen earned a bachelors degree and an MBA in her twenties. She worked in banking until she was laid off when she was about 49 years old. Lewellen began law school at age 50, and earned a JD from Santa Clara Law School in 2000 at age 54. She was admitted to the California Bar the same year, and was hired by an established mid-sized law firm, where she earned a decent income until she was laid off in 2001.

Although Lewellen's income declined after 2001, for several years she earned enough to make payments on her student loans. She made regular payments on those loans through mid-2006.

In 2005, Lewellen was laid off again, and has earned only a small income thereafter, from what is essentially a solo practice with a small loan brokerage on the side. The income she reported on her last five tax returns is as follows:

| Income Other than IRA withdrawals | | Income from IRA withdrawals |
|---|---|---|
| 2005 | $ 4,007 | $14,000 |
| 2006 | 15,854 | 50,800 |
| 2007 | 8,737 | |
| 2008 | 25,138 | |
| 2009 | 4,254 | |
| Average | $11,598 | |

The income shown above does not include income that Lewellen earned by renting part of her house, or the net losses she incurred in doing so, which are discussed in detail below.

Plaintiff testified that in 2010 she expects to have combined income of $22,104 from her law practice, the mortgage brokerage, and social security. This testimony was not contested.

LEGAL STANDARD

Guaranteed student loan debts are excepted from the discharge a debtor receives in a chapter 7 case, unless such exception from discharge "would impose undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).

To establish undue hardship, Lewellen must establish: (1) that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that she has made a good faith effort to repay the loans. United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111 (9th Cir. 1998).

"Minimal standard of living" does not mean a middle-class lifestyle, and contemplates that the debtor can be required to make "major personal and financial sacrifices," but it does not require the court to apply Internal Revenue Service standards or federal poverty guidelines. Educ. Credit Mgmt. Corp. v. Howe (In re Howe), 319 B.R. 886, 889-90 (9th Cir. BAP 2005). The court may consider such guidelines, but must make its determination on the basis of the debtor's individual circumstances, taking account of all actual

expenses that are necessary to the maintenance of a minimal standard of living by that debtor. Id. at 893-94.

THE ECMC LOAN

As of the date of trial, Lewellen owed ECMC approximately $125,000. Counsel for ECMC stated that her client does not object to a discharge of part of that amount. ECMC urges only that $25,000 of the debt should be excepted from discharge.

ECMC argues that this remaining $25,000 should not be discharged, because Lewellen has not sought to make payments adjusted to her ability to pay via the Income-Based Repayment program (IBR).

Lewellen first argues that she is not eligible for IBR. This argument is unpersuasive, because ECMC has stipulated in this court that Lewellen is eligible for the program, and this court is ready to enforce that stipulation.

Lewellen next argues that she should not be forced into IBR, because under IBR she may be subject to tax upon release-of-indebtedness income to the extent her liability ultimately is forgiven. This argument has previously been rejected by this court. See Healy v. U.S. Dept. of Educ., 2010 WL 2650438 at 3.

I determine that Lewellen should not be discharged from the remaining $25,000 of her debt to ECMC, because she failed to satisfy two elements of the three-part Pena test described above. First, Lewellen cannot establish that she has made a good faith effort to repay the ECMC debt, because she is eligible for IBR but has declined to enroll in it. See Mason v. Educ. Credit Mgmt. Corp. (In re Mason), 464 F.3d 878, 884-85 (9th Cir. 2006). Second, Lewellen failed to show that she will be unable to maintain a

minimal standard of living if she is forced to deal with her debt through IBR. It is undisputed that under IBR, she would not be required to make any payment at her current level of income. If her income increases in the future, she will be required to pay only 15 percent of the amount by which her income exceeds 150 percent of the poverty level for a family of her size. Lewellen has not shown that she could not make the limited payments required under that formula, while still maintaining a minimal standard of living. See Healy, supra, at 4-3.

ACCESS GROUP LOAN

As of the date of trial, Lewellen owed Access Group approximately $29,000. Counsel for Access Group stipulated that IBR is not available for this loan.

1. <u>Current inability to repay loan while maintaining a minimal standard of living</u>. Since the time Lewellen ceased making payments on the Access Group loan in 2006, she has earned on average less than $12,000 per year. Access Group does not dispute Lewellen's testimony that she works a 40-hour week at her solo law practice. Access Group suggests, however, that because her solo law practice earns so little, Lewellen should look for a salaried job as an attorney, a paralegal, or in her old profession, banking. Lewellen credibly testified that she has completed dozens of job applications without success. She testified that she has tried particularly hard to find a banking job, but that she has been unsuccessful, because she does not have the experience and skill in utilizing mathematical models currently required in that profession.

I credit Lewellen's testimony, and I find that Lewellen has

MEMORANDUM DECISION                -5-

attempted to maximize her income, and that her current income is not sufficient to enable her to sustain even a minimal standard of living if she is required to repay any part of her debt to Access Group. At first glance, Lewellen's general experience and education (many years in banking plus an MBA and law degree) would seem to enable her to earn a larger income. From observing Lewellen in court and listening to her work history, however, it does not appear to the court that she has the specific skills and temperament that would be necessary for her either to develop a more successful law practice, or to secure other than a starting-level job at a bank or law firm. The starting-level job option is more-likely-than-not closed to Lewellen because of her age (64 at the time of trial).

2. <u>Likelihood that Debtor's circumstances will change for the better</u>. For the reasons set forth immediately above, I also determine that there is little likelihood that Lewellen's income will increase sufficiently to permit her to repay any part of the Access Group loan while maintaining a minimum standard of living.

Access Group argues that it should receive some payment ***if*** Lewellen's income increases. Access Group concedes that the IBR program does not apply to its loan, and asks the court to impose upon Lewellen by court order obligations similar to those under the IBR program: that Lewellen be required to pay Access Group a percentage of any income over a certain level.

I decline to order such relief, because there is no practical way to coordinate such obligations with Lewellen's obligations under IBR. To require Lewellen to pay to ECMC 15 percent of any income that exceeds 150 percent of the poverty level under IBR, and

**MEMORANDUM DECISION** -6-

to order her to pay a similar amount to Access Group, would place too heavy a burden upon Lewellen. To require ECMC to share any amounts payable under the IBR formula would interfere with the rights of ECMC under the IBR program, which the Code of Federal Regulations has not made applicable to the Access Group loan. See generally 34 C.F.R. § 682.215. Any court order requiring such sharing would also undermine IBR as a program to be implemented outside the supervision of a court.

3. <u>Good faith effort to repay</u>. Lewellen offered evidence that she made payments to Access Group from 2001 through 2006, during which time she paid Access Group a total of $16,660. Lewellen also offered evidence that she was unable to make payments after 2006, because she lost her job and was unable to secure a replacement job that provided sufficient income to enable her to make any loan payments.

Access Group does not challenge the evidence described above, but argues that Lewellen did not make a good faith effort to repay. Lewellen failed to minimize her housing expense, Access Group argues, because she continued to own and reside in an expensive single-family residence in San Francisco. Access Group notes that the minimum standard of living identified in <u>Pena</u> does not mean a middle-class standard of living. Access Group introduced evidence that Lewellen could rent a fully adequate apartment for $1,500 per month, much less than the mortgage and tax payments on her house.

I agree that Lewellen was obligated to minimize her housing expense, but I find that in the past three years Lewellen's net housing expense has not been materially greater than the amount Access Group concedes is reasonable and necessary. By taking on

boarders, and by using the mortgage payments and tax payments to reduce her income tax liability, Lewellen has effectively reduced her housing expense to the amount shown in the following table.

Monthly Net Housing Expense

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Mortgage payments[1] | $3,506 | $2,970 | $3,993 |
| Real estate taxes | 402 | 378 | Included in mtg. |
| Other expenses | 548 | 686 | 224 |
| Less: | | | |
| Rental income | (2,841) | (2,222) | (2,750) |
| Tax savings[2] | (152) | (0) | (0) |
| Net housing expense | 1,463 | 1,812 | 1,467 |

Lewellen was not as successful in controlling her net housing expense in 2007, the first full year after she ceased making payments to Access Group. This fact, however, does not indicate that she did not make a good faith effort to minimize her housing expense. First, Lewellen had so little income in 2006 and 2007, other than withdrawals from her IRA, that she would have been unable to make any payments on the Access Group loan even if she had rented a $1,500-a-month apartment. Her average income monthly in 2006 and 2007 from sources other than her IRA was only $1,025.

---

[1] Mortgage payments, taxes, other expenses, and rental income for 2008 and 2009 taken from schedules A and E of federal tax returns. Data for 2010 from Plaintiff's Exhibit 1. Lewellen testified that she receives $700 per month from her ex-husband to help her meet the cost of supporting her adult disabled daughter, who lives with Lewellen. If those payments were applied to reduce rental expense, Lewellen's rental expense would be lower than shown in the table. It is doubtful, however, that the cost of housing is the only, or even major, expense incurred in maintaining a home for the daughter.

[2] Tax savings shown represent the difference between the combined state and federal tax on income other than rent, and the federal and state tax due after taking account of the deductions and losses claimed from ownership of the house. I decline to attempt to calculate any tax savings for 2010 without tax returns. Any tax savings would reduce Plaintiff's net housing expense for that year.

**MEMORANDUM DECISION** -8-

In substance, Lewellen used exempt assets to make her mortgage payments in 2006 and 2007.

Second, it is only in hindsight that we see that Lewellen was never able to secure a good replacement job after being laid off in 2005. That she did not recognize this fact immediately, and that it took her some time to realize maximum rental income from the property, does not negate the evidence of a good faith effort to repay that is embodied in her record of payments on the loan from 2001 to 2006, and in the subsequent reduction of her net housing expense from 2008 to the present.

CONCLUSION

The amount due ECMC in excess of $25,000 should be discharged, because ECMC does not object to the discharge of that debt. The remaining $25,000 due ECMC should be excepted from discharge and subject to repayment under the IBR program, because payment of the amounts due under the IBR program would not impose an undue hardship upon Plaintiff. The entire amount due Access Group should be discharged because the IBR program is not applicable to that debt, and because Plaintiff has met the three requirements of the _Pena_ test regarding that debt.

**\*\*END OF MEMORANDUM DECISION\*\***